IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
)
WILLIAM C. OLDAKER,                      )
    400 Seasage Drive, Unit 1105         )
    Delray Beach, Florida                )
                           )
        Plaintiff,                       )
                            )
        v.                               )        Civil Action No. _____
                            )
V. THOMAS LANKFORD,                       )
                            )
        and                              )
                            )
LANKFORD & REED, PLLC                     )
                            )
        Defendants.                      )
_____ )

## COMPLAINT

This is an action brought by plaintiff William C. Oldaker to recover a substantial fee for his extraordinary services rendered to defendant V. Thomas Lankford and his law firm in connection with successful legislative efforts to procure compensation for the individuals held hostage in Iran in 1979-81. After years of fruitless litigation and failed legislative proposals, defendant Lankford enlisted plaintiff Oldaker's assistance to pursue a different strategy. In less than a year, plaintiff Oldaker was successful in obtaining a desirable legislative solution where others had not. Despite that success, however, defendant Lankford has failed and refused to compensate plaintiff Oldaker for his services. Plaintiff Oldaker is entitled to and should be awarded a fair share of the professional fees of approximately $70 million provided under the enacted legislation.

## PARTIES

1.      Plaintiff William C. Oldaker is citizen of the United States and a resident of the

state of Florida.

2.      Defendant Thomas Lankford is a citizen of the United States and a resident of the

Commonwealth of Virginia.

3.      Defendant Lankford & Reed, PLLC is a Virginia limited liability company, with

its principal place of business in Virginia. At all relevant times, and on information and belief,

Lankford was a partner and managing member of Lankford & Reed, PLLC.

## JURISDICTION AND VENUE

4.      This Court has diversity jurisdiction under 28 U.S.C. § 1332. This action arises

under the laws of the District of Columbia, and the amount in controversy exceeds the $75,000

jurisdictional minimum.

5.      Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b) because a

substantial part of the events or omissions giving rise to the claim occurred in this district.

## BACKGROUND

**I.      Following years of unsuccessful attempts to obtain compensation
through the courts and Congress, legislation is finally enacted in 2015
that gives the Iranian hostages and their dependents the damages they
seek.**

**A.      Fifty-two Americans, who were taken hostage in Iran, try and fail to get
compensated in court.**

6.      On November 4, 1979, the United States embassy in Tehran, Iran was seized, and

fifty-two U.S. nationals were taken hostage. The hostages were held for 444 days, until after the

U.S. and the Islamic Republic of Iran negotiated the terms for their release on January 19, 1981.

The international executive agreement between the two countries is embodied in two

declarations by the Government of Algeria known as the Algiers Accords, 20 International Legal

Materials 223 (1981).

7.      Under the Algiers Accords, the United States agreed to "bar and preclude the prosecution against Iran of any pending or future claim of . . . a United States national arising out of the events . . . related to (A) the seizure of the 52 United States nationals on November 4, 1979, [and] (B) their subsequent detention." General Declaration ¶ 11, 20 I.L.M. at 227.

8.      Despite this agreement, since 1983 the former hostages (and their families) have attempted to sue Iran for compensation. *See*, *e.g.*, *Persinger v. Islamic Republic of Iran*, 729 F.2d 835 (D.C. Cir. 1984); *McKeel v. Islamic Republic of Iran*, 722 F.2d 582 (9th Cir. 1983); *Ledgerwood v. State of Iran*, 617 F. Supp. 311 (D.D.C. 1985); *Roeder v. Islamic Republic of Iran*, Case No. 1:00-cv-03110 (EGS), 195 F. Supp. 2d 140 (D.D.C. 2002) ("*Roeder I*"). In each case, the court held that the plaintiffs were barred from recovering, either due to the Algiers Accords or the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602 *et seq.* (1976).

9.      *Roeder I*, a case in which Lankford and a team of other lawyers represented the plaintiffs, sought both compensatory and punitive damages from Iran. During the proceedings, the U.S. government intervened and moved the case be dismissed on the basis that the suit did not meet all of the requirements of the terrorist State exception to the Foreign Sovereign Immunities Act and that the suit was barred by the Algiers Accords. The court held that while Congress could abrogate the Algiers Accords "clearly and unambiguously," Congress had not done so as of 2002. *Roeder I*, 195 F. Supp. 2d at 166, *aff'd* 333 F.3d 228 (D.C. Cir. 2003).

10.     After *Roeder I*, legislative measures were proposed in Congress to enable the hostages to recover damages from Iran. In the 107th Congress, the Senate Appropriations Committee included language in the Departments of Commerce, Justice and State Fiscal Year 2003 Appropriations Act that the Algiers Accord was abrogated for the purpose of providing a cause of action for the Iranian hostages.  However, the bill was not signed into law. In the 108th

Congress, amendments were included in three appropriations bills that expressly would have abrogated the Algiers Accords, but in each case the language was struck before being signed into law.

11.     The 110th Congress passed the National Defense Authorization Act of 2008, Pub.L. 110–181, 122 Stat. 3 (2008) in January 2008.  The bill amended the Foreign Sovereign Immunities Act by reformulating the terrorism exceptions to sovereign immunity while creating certain private rights of action. The conference report associated with the amendment stated: "The provision would also provide for courts to hear a claim under this section if the terrorist act is related to Case Number 1:00CV03110 (EGS) [*Roeder I*] in the United States District Court for the District of Columbia. The conferees intend that nothing in this section would prejudice the claimants or their representatives in that case." It did not, however, specifically reference the Algiers Accords.

12.     Lankford and a team of lawyers soon filed a new lawsuit in D.C. District Court, invoking the new law on the basis that it permitted pending suits against state sponsors of terrorism to be refiled under certain conditions. The suit sought $6.6 billion in compensatory and punitive damages.

13.     Like its predecessors, that lawsuit failed. The Court held that Congress did not unambiguously create a cause of action by clearly abrogating the Algiers Accords.  *See Roeder v. Islamic Republic of Iran*, 742 F. Supp. 2d 1, 17–18 (D.D.C. 2010) ("*Roeder II*"); *aff'd*, 646 F.3d 56 (D.C. Cir. 2011); *cert. denied*, 132 S. Ct. 2680 (2012).

**B.     After failing to get legislation enacted into law, Lankford brings William C. Oldaker onto the team in early 2015 and only then is Congress persuaded to provide nearly $300 million in compensation for the Iran hostages.**

**1.     Lankford and his team fail to get Congress to act on legislation to compensate Iranian hostages and dependents.**

14.     Having failed in court, Lankford realized that the hostages could not and would not get compensated without new legislation.

15.     On November 15, 2011, Lankford hired Cornerstone Government Affairs to assist in the passage of legislation by Congress to compensate the Iranian hostages and their dependents.

16.     In the second session of the 113th Congress (2014), Lankford and his team – including lobbyists at Cornerstone Government Affairs and media and public relations consultant Alan Madison – were hopeful that Congress would pass legislation that authorized payments to the fifty-two hostages and payments to their dependents. The legislation they advocated was introduced by Senator Johnny Isakson (R-GA) and would have compensated each hostage $10,000 per day for captivity while also providing dependents (spouses and children) with $5,000 per day of the hostage's captivity.

17.     There was also a less generous bill introduced by Representative Bruce Braley (D-IA) that would have provided each hostage $5,000 per day plus a lump-sum of $150,000 while dependents would receive $5,000 per day.

18.     As the year 2014 progressed, however,  Lankford became concerned that the existing team would fail to secure passage of any legislation.

   **2.     Lankford recruits Oldaker to join the team to provide a legislative
            roadmap and congressional strategy.**

19.     Enter plaintiff Oldaker, who had an extensive career holding high-level positions in Washington, DC: From 1968 to 1975, he served as an assistant to the Chairman of the U.S. Equal Employment Opportunity Commission; he later served as General Counsel to the Federal Election Commission from 1976 to 1979; from 1979 to 1980, Oldaker was General Counsel and Treasurer to the Kennedy for President Committee; and in 1999, President Clinton appointed

Oldaker to serve on the National Bioethics Advisory Commission, on which he sat until 2002.

20.     After the 1980 presidential election, Oldaker entered private practice. There, he represented Senator Joe Biden in his 1988 presidential run and General Wesley Clark in his 2004 presidential run; and served as ethics and election law counsel to several Senators and House members, including representing Speaker Jim Wright and serving as outside counsel for the House Administration Committee on the House post office investigation. In addition, Oldaker lobbied Congress on behalf of a broad range of clients such as Federal Express and an electric utilities coalition that included Commonwealth Edison, Houston Power and Light, Florida Power and Light, and Carolina Power and Light.

21.     Oldaker was acquainted with Alan Madison, who had acted as a media and public relations consultant on Lankford's team beginning in 2011. As of spring 2014, when Lankford's team had still not persuaded Congress to enact meaningful legislation, Madison approached Oldaker. On May 2, 2014, Madison met with Oldaker and sought his advice regarding the hostage lobbying effort.

22.     Madison introduced Oldaker to Lankford, and the trio met on May 22, 2014. During that meeting, Lankford told Oldaker that Cornerstone was making insufficient progress and asked Oldaker if he would help. Oldaker demurred. He did not believe that he could provide valuable assistance at that point.

23.     Throughout the summer and fall of 2014, Lankford and Oldaker met a number of times. Throughout, Lankford approached Oldaker about joining the team to work on the Iranian hostage matter. Toward the end of 2014, Oldaker became more amenable to working on the Iranian hostage matter as he perceived a way that success could be accomplished.

24.     On December 30, 2014, Lankford emailed Oldaker to request that the two of them

sit down again after the holidays to produce a "game plan." In early January 2015, Lankford

again told Oldaker that he was disappointed in Cornerstone's handling of their legislative

strategy and operation.  Lankford said he wanted Oldaker to help come up with a strategy and

action plan that would get the legislation enacted into law.

25.     By the end of January 2015, Oldaker agreed to assist Lankford and, based on his

experience and understanding of the Congress, devised an approach that he thought would be

successful. He believed that the strategy of trying to get a separate bill passed to compensate the

hostages and their dependents under regular order was nearly impossible.  His strategy was to

have legislative language benefitting Lankford's clients inserted into the year-end omnibus

appropriations bill, which would require a "champion" of the issue to be present during

negotiations of the year-end omnibus appropriations bill. He believed that trying to have

payment language included in the year-end omnibus appropriations bill had a reasonable chance

at success, but only if it was being pushed aggressively by one of the final negotiators.

26.     Oldaker knew that the legislators involved in the appropriations bill process were

typically: the Senate Majority Leader, the Senate Minority Leader, the House Speaker and the

House Minority Leader.

27.     Oldaker also knew that the process for negotiating and hammering out the final

appropriations bill was that the legislators made their positions on the various issues known to

their Chiefs of Staff who then got together and negotiated what was to be included in the final

bill. He also knew that to insure success for an item like the hostage payments added on to the

bill it was vitally important to have someone who strongly believed in its importance who would

be in the room with the other negotiators and push for its inclusion in the final language of the

bill.

28.     Oldaker had a long, well established working relationship with Senate Minority Leader Harry Reid (D-NV) and his Chief of Staff, and believed that he was well positioned to advocate for the addition of the hostage payments to the bill and would be able to monitor and assist in moving it toward inclusion in the final language of the bill. Oldaker was able to convince Reid and his staff to not only include payments to the former hostages and their dependents as part of the year-end omnibus appropriations, but to also get Reid's staff to push hard for the payments provision during Senate-House negotiations. Oldaker believed that unless Reid and his staff were pushing aggressively for payments to the former hostages and their dependents, the provision would be excluded from a final bill.

**3.     Lankford, Oldaker and others work through 2015 on stand-alone legislation to compensate the hostages and their dependents.**

29.     For much of 2015, the team Lankford had assembled worked to get a stand-alone bill drafted and introduced in the Senate and House of Representatives.  Oldaker spent an extraordinary amount of time participating in meetings and conference calls and even more time drafting e-mails and developing other materials to support the bill language. His tactic was to get a bill introduced with the hostage payments, knowing that the possibility of passage of a stand alone was limited, but knowing that the provisions of a stand alone bill could be inserted into the appropriations bill with the understanding that they had the support of the sponsors and committee members who voted it out.

30.     Senator Isakson introduced a bill in March 2015 that provided $10,000 per day to hostages and $5,000 per day to spouses and children. Later, the Senate  Foreign Relations Committee reduced the payments to $6,750 per day to hostages and a $600,000 payment to hostages' spouses. The children of hostages would receive no payments.

31.     Throughout the spring and summer of 2015, Cornerstone Government Affairs, led

by lobbyist Mike Smith, could not find a sponsor to introduce a companion bill in the House.  It

was not until one of the former hostages, Kevin Hermening, mentioned that he knew

Representative Sean Duffy (R-WI) that there seemed to be a chance for a companion House bill.

Ultimately, through this avenue Rep. Duffy introduced a bill at the end of July 2015 providing

$6,750 per day for hostages and a one-time payment of $600,000 for family members.

32.     At the end of October, Representative Steve Chabot (R-OH) introduced a bill that,

among other provisions, provided the Iranian hostages with $10,000 per day of captivity but no

payments for spouses or children.

33.     Oldaker maintained constant contact with Senator Reid's staff, including his

Chief of Staff, throughout 2015 regarding the various Iranian hostages bills and their progress.

Oldaker knew that the strategy to have language relating to the hostages and their dependents

included in the year-end appropriations bill remained the most likely successful option.

**4.      Oldaker executes a game plan that results into a legislative success by
having language to compensate the hostages and their dependents in
the year-end appropriations omnibus bill.**

34.     By early November 2015 it became clear that passage of a stand-alone bill to

compensate the fifty-two hostages and their dependents was not realistic before the end of the

year. It also was clear that Congress would have to pass an end-of-the-year omnibus

appropriations bill to fund the government. Given these realities, Oldaker contacted Reid's Chief

of Staff to inquire about including payments for the hostages and their dependents in the final

bill.

35.     Over the next month Oldaker and Reid's Chief of Staff spoke frequently to

confirm that Reid's staff was pushing for inclusion. This message was relayed back to Lankford.

By early December Reid's Chief of Staff again confirmed that Reid was pushing for payment

language but reported that House negotiators were pushing for lower payment amounts. Oldaker provided this information to Lankford.

36.     On December 5, 2015 Smith from Cornerstone Government Affairs told Lankford that the group's efforts were in trouble and a deal had already been made that was not satisfactory to Lankford.  Oldaker disagreed, stating to Lankford that the trouble was only in the House and that Reid had not been dissuaded. Lankford agreed with Oldaker. Around the same time, Paul Dinino, another lobbyist from Cornerstone, had inquired with Reid's staff about what was being negotiated but Dinino was under the assumption that any deal was dead.

37.     On December 7, 2015, Oldaker made another push with Reid's Chief of Staff to get the hostages paid at a higher amount.  Reid's Chief of Staff indicated that the deal was still being negotiated.  He asked Oldaker which would be preferable, having payments to the hostages and their dependents at a lower amount than what was included in the Isakson or Duffy bill, or being excluded completely.  Oldaker replied that the hostages and dependents would rather be included at a lesser amount than being left out completely, but he asked for the highest compensation achievable.

38.     On December 16, 2015, Congress passed the "Consolidated Appropriations Act, 2016", which included the Justice for United States Victims of State Sponsored Terrorism Act, Pub. L. 114-113, div. O, title IV, § 404, 129 Stat. 3007 (Dec. 18, 2015). The Act established a fund from which the former Iran hostages would be entitled to receive payments of $10,000 per day of captivity and a lump sum of $600,000 for each of their spouses and children, higher than the amount in either the Isakson or Duffy bills.

39.     The Act established the United States Victims of State Sponsored Terrorism Fund. The former Iranian hostages and the dependents would collectively be entitled to

approximately $290 million. Funds would come from fines imposed on those supporting

terrorism. Payments would be made as soon as there was sufficient money available in the Fund.

40.     The bill also contained a specific provision for the Iran embassy hostages and

their dependents. While other victims of state-sponsored terrorism would need to obtain specific

federal judgments entitling them to compensation, the former Tehran embassy hostages and their

family members would need only prove that they were members of proposed class put forth in

*Roeder I.*

41.     The Act also provided that money in the Fund would be distributed pro rata to all

eligible claimants until everyone had received the compensation to which they were entitled.

42.     As a result of the Act, the Lankford team could receive up to $72.5 million in

compensation (twenty-five percent of $290 million) for its work on behalf of the former Iran

hostages.

43.     First payments to Lankford's clients were made from the United States Victims of

State Sponsored Terrorism Fund in March 2017. At that point, Lankford became entitled to legal

fees consistent with his client agreements.

> **II.     Lankford recruited Oldaker to pursue the ultimately
> successful legislative strategy in exchange for a fair share of
> the recovered fees.**

44.     When initially approached to work on the Iranian hostage legislative effort,

plaintiff Oldaker explained to Lankford that he had a successful practice that did not rely on

contingency fee cases. Based on Lankford's representations, however, Oldaker eventually agreed

to proceed on a contingency fee basis in the case of the hostages. Oldaker believed that a similar

agreement existed for all members of Lankford's team, *i.e.* that they would receive a percentage

of the fees received.

45.     Throughout the process, Lankford told Oldaker that precise compensation for all team members would be determined upon the results of each member's contribution towards the team's overall success, and not based upon the amount of time expended or on other considerations. Further, Lankford stated that compensation would be "fair" and based on Lankford's evaluation of contributions relative to the other team members.

46.     Lankford told Oldaker that nobody on the team had an agreement, much less a written agreement, for a specific fee or percentage of the fee. Lankford did so to prevent Oldaker from insisting that Lankford confirm in writing what he had promised orally: a fee-splitting arrangement in which Oldaker could reasonably expect to receive a percentage of the fee if his efforts succeeded. By doing so, Lankford also signaled to Oldaker that because the other team members trusted Lankford to fairly distribute a potentially large sum of money, Oldaker should trust Lankford as well.

47.     At least three times in 2015, Lankford told Oldaker that no one else had any agreement for a particular percentage of the overall fee, team members would be compensated with a percentage of the fee, and "if you perform, you will be compensated fairly."

48.     On March 23, 2016, Oldaker and Lankford met for lunch at the Hay-Adams Hotel.  Oldaker's intention for the meeting was to ask Lankford how he would be paid for his work on the Iran hostage project. Lankford responded that he expected to keep approximately 60% of the fees, and that the rest would be split fairly among the team's various lobbying and public-relations professionals, such as Madison, Oldaker, and Cornerstone.  Oldaker asked Lankford if he had performed and proved valuable to the enactment of the statute.  Lankford replied yes, that Oldaker had performed and provided very good value.  Lankford also told Oldaker that no team members had any specific agreements on how fees would be shared.

**III.     Lankford continues to utilize Oldaker and introduces new joint cases, but then reneges on his compensation agreement with Oldaker.**

49.     After the statute became law, there was still a great deal of work to be done before payments were made to the hostages and the dependents. This included getting the United States Victims of State Sponsored Terrorism Fund (USVSSTF) established with a Special Master and applications submitted.

50.     At the beginning of 2016, Lankford enlisted Oldaker to help lobby for a Special Master that would view the Iranian hostages and their dependents favorably. From January until the end of March 2016 Oldaker and Lankford met and spoke numerous times to discuss strategy and how to proceed. Further, Oldaker wrote several documents at Lankford's request regarding the appointment of the Special Master.

51.     In late spring and early summer 2016 the focus shifted to how the Fund would pay the hostages and their dependents, specifically if they would be subject to the pro-rata provision.  Oldaker and Lankford exchanged several e-mails and had several phone discussions regarding payments, the status of the Fund, and court cases that might have an impact on the Fund. Again at Lankford's request, Oldaker prepared several documents, including a comprehensive white paper on the Fund's legislative history between 2014 and 2015.

52.     During this time, Oldaker only interacted with Lankford on these projects. Cornerstone or its lobbyists were not part of the discussions between Lankford and Oldaker.

53.     At the same time, during the first half of 2016, Oldaker assisted Lankford with other projects related to the Fund. One project was the creation of a bank account and a system to collect and distribute money from the Fund to ensure Lankford was paid by his clients. Another project had Oldaker investigating, arranging, and attending meetings about early

payment/claim settlements for hostages.  Ultimately, Lankford decided to pass on behalf of his clients.

54.     In 2016, Lankford also proposed to Oldaker that they work on new cases, with any recovered attorney fees split between them 50%-50%.  The first was on February 3, 2016 when Lankford and Oldaker met about *Sherry Sullivan v. The Republic Cuba*.  This case involved a claim into the USVSST Fund by Sherry Sullivan for the wrongful death her father at the hands of the government of Cuba. It was agreed that if Sullivan was awarded any money from the USVSST Fund, 25% of any award would be held for attorney fees. The split was that 50% of fees would go to local counsel in Maine, and the remaining fees would be split 50%-50% between Lankford and Oldaker. There was no agreement between the parties that the payment in these cases would be in lieu of or have any effect on the payment owed to Oldaker for his work on the Iran hostage case.

55.     At the Hay-Adams Hotel lunch on March 23, 2016 Lankford told Oldaker that the amount allocated for attorney's fees in the Iran hostage matter would be split fairly among the team's various lobbying and public-relations professionals and that Oldaker had performed and provided value. Lankford never mentioned in any way that Oldaker's compensation would be from the Sullivan case or any other case.

56.     On June 9, 2016, Lankford introduced Oldaker to a second case dealing with the individuals whose situation was the basis for the movie, *Argo*. The latter were six American diplomats who had evaded capture during the Iranian hostage crisis but were forced into hiding before finally escaping from Iran. Again, the agreement between Lankford and Oldaker provided that 25% of any reward would be held for attorney fees and that amount would be split 50%-50% between Oldaker and Lankford.

57.     The case involving the *Argo* individuals required Oldaker to get a change in statute and then successful applications into the USVSST Fund. Lankford again did not indicate or discuss with Oldaker that the *Argo* case (or the *Sullivan* case) would serve as payment for the work that Oldaker had done on the Iranian hostage matter – and was continuing to do – on behalf of Lankford.

58.     Oldaker moved forward with both cases with the understanding that the fees from the two cases would be split between Lankford and Oldaker, and that Oldaker would be paid a to-be-determined amount from the legal fees resulting from the Iranian hostages and dependents payments.

59.     Lankford also referred three other cases to Oldaker in 2016 which ultimately were not worthwhile.  These cases involved applications into the USVSST Fund but in each case the claimant's statute of limitations had expired. However, when referred to Oldaker, the understanding was always that legal fees be split between Lankford and Oldaker.

60.     Both the *Sullivan* case and *Argo* case proved to be extremely difficult. *Sullivan* required getting a federal judgment against Cuba and *Argo* required a rewrite of federal law. Oldaker dedicated a considerable amount of his time working on both cases. Oldaker knew the chances at success for either was slim and that it would take years before any final judgments or legislation could be finalized.

61.     As Oldaker told Lankford during their initial 2014 meetings, Oldaker was generally not in the practice of taking contingency fee cases. Oldaker would not have agreed to work on the *Sullivan* or *Argo* cases and split any legal fees with Lankford had he believed that such fee splitting would serve as compensation for Oldaker's efforts on the Iranian hostage matter.

62.     To induce Oldaker to join the team, Lankford promised to compensate Oldaker for his services on the basis of success of the project. Payment would come from the legal fees that Lankford expected to receive for the successful enactment of a federal statute that would pay the fifty-two hostages and their dependents. Despite inquiries from Oldaker about a formal engagement, Lankford insisted that no formal engagements were being made and that everyone on the team would receive a "fair" percentage of the fee based on results achieved and the individual performance of each team member.

63.     In March 2017 when the initial payments to the hostages and their dependents were made and legal fees were collected, Lankford, for the first time, told Oldaker that Oldaker had already been compensated by the fact that Lankford had referred other cases to Oldaker (*Sullivan*, *Argo*, etc.). Lankford then claimed that Oldaker was owed nothing more for his work on the Iran hostage matter.

64.     Lankford said that the fees on the referred cases would be approximately what Oldaker would have received for his work on the Iran hostage matter.

65.     Oldaker immediately told Lankford that this was the first time this issue had been raised and that he disagreed with this statement.

66.     Oldaker reminded Lankford that the agreement on the referred cases was that Lankford and Oldaker would work together and split any legal fees 50%-50% .

67.     Oldaker also told Lankford that he never would have accepted the referred cases, which were contingency fee-based, if he had been told at the time that those case referrals were for compensation for his work on the Iran hostage matter and the enactment of Pub. L. 114-113.

**COUNT I:     Breach of Contract - Contingent Fee Contract**

68.     Plaintiff incorporates the allegations set forth in the paragraphs above.

69.    An oral contract existed between Oldaker and Lankford.

70.    The terms of the contract were clear and definite. Oldaker would receive a fair share of the approximately $70 million in fees provided under the legislation. Oldaker understood that the precise amount depended on future events but that the estimated amount would be in the range of 10% of the total fees, or approximately $6.5 million.

71.    Oldaker fully performed his obligations under the contract with Lankford and his law firm. The legislation that was signed into law was primarily the result of Oldaker's legislative strategy and Oldaker's participation on the team.

72.    Lankford reneged on his agreement with Oldaker to pay him a fair share of the contingent fee for his services.

73.    As a result of Lankford's breach of his and his firm's contractual obligations, Oldaker has suffered damages.

**COUNT II:    Breach of Unilateral Contract - Contingent Fee Contract**

74.    Plaintiff incorporates the allegations set forth in the paragraphs above.

75.    Should the court find that a contingent fee contract did not exist, in the alternative plaintiff pleads that a unilateral contract existed between Oldaker and Lankford.

76.    The terms of the unilateral contract were clear and definite. Lankford promised to pay Oldaker a contingency fee in exchange for his services in obtaining legislation compensating the Iran hostages. While the precise amount depended on future events, the estimated amount would be in the range of 10% of the total fees, or approximately $6.5 million.

77.    Oldaker began performance of the unilateral contract and continued to perform for over a year.

78.    Lankford is bound by the unilateral contract and is obligated to pay Oldaker his

contingent fee.

79.     As a result of Lankford's breach of his and his firm's obligations under the unilateral contract, Oldaker has suffered damages.

**COUNT III:  Breach of Quasi Contract**

80.     Plaintiff incorporates the allegations set forth in the paragraphs above.

81.     Should the court find that neither a contract nor implied contract existed between Oldaker and Lankford, in the alternative plaintiff pleads that a quasi contract existed between Oldaker and Lankford.

82.     Oldaker conferred a benefit on Lankford; namely Oldaker was instrumental in achieving legislation that led to compensation for Lankford's Iran hostage clients.

83.     Lankford was aware that Oldaker was performing services on his behalf with expectation that Lankford would pay for those services.

84.     As a result of Oldaker's efforts, Lankford has obtained a benefit of approximately $70 million.

85.     It would be inequitable and unfair for Lankford to be able to accept and retain his benefit without paying for the value of that benefit.

86.     Lankford has been unjustly enriched from Oldaker's services.

87.     Oldaker is entitled to restitution for the reasonable value of his services, which is 10% of the total fees, or approximately $6.5 million.

88.     As a result of Lankford's breach of his and his firm's contractual obligations, Oldaker has suffered damages.

**COUNT IV:  Breach of Fiduciary Duty**

89.     Plaintiff incorporate the allegations set forth in the paragraphs above.

90.   By insisting that Oldaker trust his judgment and integrity in connection with any decision about what percentage of gross fees Oldaker would be paid, Lankford (on his own behalf and on behalf of his firm) stood in fiduciary relation to Oldaker with respect to Oldaker's compensation.

91.   A fiduciary relationship also arose between Lankford and Oldaker because, well in advance, both parties understood that any fees would be paid to Lankford & Reed, who would then have a duty to disburse those funds in accordance with the parties' agreements.

92.   Lankford fostered Oldaker's trust, further establishing a fiduciary relationship by invoking his standing in the legal community and ethical obligations as a lawyer; and by representing to Oldaker that other members of the team trusted him enough to forgo a written agreement about their precise compensation.

93.   The agreement between the parties meant that Lankford would in essence be acting as an escrow agent for the funds that would be disbursed to him, and held in trust by him, before being distributed to the other members of the team.

94.   Because Lankford fostered Oldaker's trust in Lankford's integrity and good faith, Oldaker failed to take other precautionary measures, such as insisting that Lankford agree in writing to what he had agreed orally: That Oldaker would be entitled to a percentage of the gross fees.

95.   Because of the fiduciary relationship between Lankford and Oldaker, Lankford owed Oldaker a duty to refrain from seeking, secretly or otherwise, to personally profit at Oldaker's expense.

96.   Knowing all along that Oldaker expected to receive a percentage of the fees the team obtained compensation for the Iranian hostages, and that Oldaker's expectation was based

upon the trust in Lankford's good faith and integrity that Lankford intentionally fostered, Lankford had a heightened duty to refrain from undermining Oldaker's expectations to Lankford's own personal benefit.

97.     By refusing to pay Oldaker anything from the gross fee of the Iranian hostages compensation, Lankford breached his fiduciary duty to Oldaker.

**COUNT V:   Quantum Meruit**

98.     Plaintiff incorporate the allegations set forth in the paragraphs above.

99.     Oldaker provided valuable services to Lankford.

100.    Lankford and his law firm accepted and enjoyed the benefits of those services under circumstances that reasonably notified them that Oldaker expected to be paid for them.

101.    Lankford was aware that Oldaker expected compensation for the reasonable value of his services by his actions with respect to the Sullivan and Argo cases.

102.    Nonetheless, Lankford refused to accordingly compensate Oldaker.

103.    As a result, Oldaker suffered damages by not being paid for the reasonable value of his services.

**COUNT VI:   Unjust Enrichment**

104.    Plaintiff incorporates the allegations set forth in the paragraphs above.

105.    Oldaker conferred a benefit on defendants by performing valuable services that helped them obtain tens of millions of dollars of fee compensation.

106.    Defendants understood that Oldaker was entitled to a fair percentage of that fee compensation, proportionate to his contribution towards the overall result, yet have refused to pay it to him.

107.    Under the circumstances, retaining Oldaker's share of the fee compensation is

unjust.

### COUNT VII: Promissory Estoppel

108.     Plaintiff incorporate the allegations set forth in the paragraphs above.

109.     If the other counts described above fail to redress Oldaker injuries, Oldaker has a claim for promissory estoppel.

110.     Lankford, on his own behalf and on behalf of his firm, made a series of promises to Oldaker so as to induce Oldaker's reliance.

111.     Oldaker reasonably relied on those promises to his detriment. He spent time which could have been allocated to other matters over a period in excess of a year.

112.     The only way to avoid injustice is to enforce Lankford's promises to compensate Oldaker fairly.

### REQUEST FOR RELIEF

Plaintiff demands judgment against defendants as follows:

a.  Compensatory damages, in an amount to be determined at trial;

b.  An accounting from Lankford & Reed;

c.  Pre-judgment interest;

d.  Post-judgment interest;

e.  Attorney's fees and costs; and

f.  Any other relief that the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable.

Respectfully submitted,

s/ Mary Lou Smith
James E. Anderson
D.C. Bar No. 230839
Mary Lou Smith
D.C. Bar No. 389507
HOWE, ANDERSON & SMITH, P.C.
2401 Pennsylvania Avenue, N.W., Suite 350
Washington, D.C.  20037
202-296-5680
202-331-8049 fax
janderson@haspc.com
mlsmith@haspc.com

Attorneys for Plaintiff

August 13, 2018